UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

WHITE CONSTRUCTION COMPANY,
INC., a Florida corporation, LIMEROCK
INDUSTRIES, INC., a Florida corporation,

                Plaintiffs,

-vs-                           Case No. 5:05-cv-328-Oc-10GRJ

MARTIN MARIETTA MATERIALS, INC., a
foreign corporation, MARTIN MARIETTA
MATERIALS OF FLORIDA, LLC, a foreign
limited liability company,

                Defendants.

_____/

# O R D E R

This case is before the Court for consideration of Defendants Martin Marietta

Materials, Inc. and Martin Marietta Materials of Florida, LLC's Motion for Final Summary

Judgment, (Doc. 80), to which Plaintiffs White Construction Company, Inc. and Limerock

Industries, Inc., have filed a response in opposition (Doc. 101). Upon due consideration,

and for the reasons discussed below, the Court concludes that the Defendants' motion is

due to be granted in part and denied in part.[1]

---

[1]The Defendants have also filed a motion to dismiss the Plaintiffs' Third Amended
Complaint (Doc. 50). Because the arguments raised in the motions to dismiss and for summary
judgment overlap in large part, the Court will focus primarily on the motion for summary judgment,
and only consider any additional arguments raised in the motion to dismiss where necessary.

## Undisputed Material Facts

I.    The Parties

Plaintiffs White Construction Company, Inc. ("White Construction") and Limerock Industries, Inc. ("Limerock Industries"), (collectively "the Plaintiffs") are both Florida corporations engaged in the construction business with their principal places of operation in Chiefland, Levy County, Florida.   The late Luther White, Sr. and his wife were the majority stockholders of both corporations, and they were considered sister corporations. A large portion of White Construction's and Limerock Industries' work was devoted to road construction projects for the Florida Department of Transportation.

Since the 1950s, both White Construction and Limerock Industries have operated a limerock mining facility in Taylor County, Florida, known as the "Cabbage Grove" Quarry. The mining operations conducted at Cabbage Grove included the production, marketing, distribution, and sale of limerock, crushed rock, and other aggregate products that are traditionally used in road construction projects.   The limerock at Cabbage Grove is very valuable because it is the only source of hard aggregate rock north of the oolite seam near Miami, Florida, and the Plaintiffs invested millions of dollars into its operations at the quarry.  They renewed the lease on the land on several occasions, installed equipment to conduct mining, and moved other equipment to the property for use in mining operations.

The owner of Cabbage Grove during the relevant time period of this case was Foley Timber and Land Company, Limited Partnership ("Foley"), and until April 1, 2002, the

Plaintiffs leased Cabbage Grove from Foley to conduct their mining operations. White Construction and Limerock Industries also leased land for its mining operations at two other quarries located in Marion County, Florida - the O'Neal Quarry, and the Clifton Quarry. However, Cabbage Grove was considered the "crown jewel" of the Plaintiffs' mining operations because of its high value.

Defendant Martin Marietta Materials, Inc. ("Martin Marietta") is a North Carolina corporation with its principal place of business in Raleigh, North Carolina. Martin Marietta is a well-known and experienced mining company with an established distribution network in Florida and throughout the United States. It is the second largest supplier of limerock aggregate in the United States, and has extensive operations throughout the Southeast.

Defendant Martin Marietta Materials of Florida, LLC ("Martin Marietta Florida") is a Delaware limited liability company and a wholly owned subsidiary of Martin Marietta. Martin Marietta Florida's principal place of business is in Raleigh, North Carolina, and its sole member is Martin Marietta. Martin Marietta created Martin Marietta Florida in 2002 as a vehicle to facilitate the execution of the Mining Services Agreement with White Construction and Limerock Industries.[2]

---

[2]Given the close relationship between Martin Marietta and Martin Marietta Florida, as well as the Parties' frequent failure to distinguish between the two entities, the Court will refer to both companies collectively as Martin Marietta, except at times where a distinction is necessary.

## II.    The Letter of Intent

In the late 1990s, Martin Marietta approached White Construction and Limerock Industries about possibly purchasing the mining operations at Cabbage Grove, as well as certain other real property. The negotiations were ultimately unsuccessful; however, in late 1998 and early 1999, Martin Marietta renewed discussions with the Plaintiffs about purchasing their interest in Cabbage Grove. On January 29, 1999, the Parties entered into a confidentiality agreement whereby White Construction provided Martin Marietta various documents, including a copy of White Construction's mining lease with Foley.[3]

In March 2000, before this second round of negotiations concluded, the State of Florida initiated criminal proceedings against White Construction. The proceedings resulted in the indictment of White Construction for several crimes in connection with its dealings with the Florida Department of Transportation, including charges of racketeering and grand theft. In May 2002, the criminal charges were expanded to include individual charges against Luther White, Sr., his son Luther White, Jr., and Luther White III. Limerock Industries has never been named as a defendant in any criminal proceedings.

At some point between March 2000 and September 2001, Martin Marietta became aware of the criminal proceedings against White Construction. Martin Marietta did not, however, cease its discussions with the Plaintiffs concerning Cabbage Grove. These

---

[3]White Construction provided Martin Marietta with a second copy of the mining agreement during the subsequent discussions finalizing the Letter of Intent.

discussions ultimately resulted in the execution of a Letter of Intent ("LOI") between Martin

Marietta Materials and Limerock Industries on September 27, 2001. (Doc. 44-2).[4]

The LOI memorialized Limerock Industries' interest in selling and Martin Marietta's

interest in purchasing "certain of the assets related to the operation of Limerock

[Industries], specifically those conducted at the Cabbage Grove Quarry in Taylor County,

Fla., O'Neal Quarry in Marion County, Fla., and Clifton Quarry in Marion County, Fla."

(Doc. 44-2, p. 1). The first page of the LOI stated, in relevant part:

> This non-binding letter describes the basic terms of the proposed
> transaction, along with various examinations of Limerock that
> must be concluded to the satisfaction of [Martin Marietta] prior to
> the execution of a legally binding agreement. **THIS LETTER
> EXPRESSES THE INTENT OF THE PARTIES FOR
> DISCUSSION PURPOSES ONLY FOR USE IN DRAFTING A
> DEFINITIVE CONTRACT. THIS LETER IS NOT INTENDED TO
> CREATE NOR SHOULD IT BE CONSTRUED AS CREATING
> ANY LEGAL OBLIGATION TO CONCLUDE THIS
> TRANSACTION UNDER THE TERMS OUTLINED HEREIN OR
> ON ANY OTHER TERMS OR CONDITIONS NOR IS IT
> INTENDED TO CREATE ANY OTHER OBLIGATION EXCEPT
> FOR THE OBLIGATIONS SET FORTH IN PARAGRAPHS E
> AND F.**

(Id., p. 1) (emphasis in original).

The LOI provided that once it was signed by both parties, Martin Marietta would

begin to draft a "definitive contract to the mutual satisfaction of the parties hereto." Id. The

---

[4]Over the course of the years, while the Parties continued their discussions, White
Construction and Limerock Industries also entered into negotiations with five other prospective
buyers. However, Martin Marietta was the only interested buyer who made a written proposal for
the purchase of assets at three quarries - Cabbage Grove, Clifton, and O'Neal.

LOI listed several terms and conditions which the parties anticipated the definitive contract would contain, along with other terms to be negotiated at a future date. Some of the terms included in the LOI were an anticipated purchase price of $15,500,000 for all of the assets used in Limerock Industries' operations at the three quarries, including all real property, plants, and equipment used at each quarry; an additional payment of up to $1,161,000 for product inventory that was saleable in the normal course of business within one year from the date of the contract's closing; and a separate payment for all outstanding accounts receivable at the time of closing.[5] (Doc. 44-2, pp. 1-3). The LOI also provided that Limerock Industries would facilitate the renegotiation of the leases at each quarry under terms satisfactory to Martin Marietta, including the right to mine, blast, quarry, and remove deposits from the land, and that the parties would execute and record a Memorandum of Lease in the land records for the jurisdictions where each quarry was located. Id. at p. 3.

The LOI stated that the "definitive contract" would include appropriate representations, warranties, and guarantees by Luther White, Sr. and the shareholders of Limerock Industries as to Limerock Industries' contractual obligations. The LOI also stated that "[t]he definitive contract would further provide that consummation of the transaction would be contingent upon the fulfillment of certain conditions," such as a good faith due diligence review of all corporate records, and approval of the transaction by the officers and directors of both Limerock Industries and Martin Marietta. (Doc. 44-2, pp. 4-5).

---

[5]The Parties also anticipated allocating $725,000 of the asset purchase price to a non-compete agreement between Limerock Industries and Martin Marietta.

The LOI listed a closing date for the definitive contract of March 1, 2002, and that Limerock Industries would refrain from negotiating with any third parties for the sale of the shares or assets of the mining operations until after that date. The LOI also provided that "either party, without further obligation or liability to the other, may terminate this letter of intent or the negotiations resulting from it, merely by giving written notice to the other." (Doc. 44-2, p. 6).

III.    The O'Neal and Clifton Leases

 Following execution of the LOI, the Parties began the process of due diligence, which included Martin Marietta examining the existing quarry leases, verifying the quality of the limestone aggregate, and examining the title and encumbrances on the equipment Limerock Industries was proposing to sell under the LOI. The Parties also made various attempts to negotiate the terms of a definitive asset purchase agreement and a supply agreement, as well as a non-compete agreement for the Plaintiffs. Over the next several months, the Parties circulated various drafts of the agreements, and representatives from each company met on at least two occasions to discuss the progress of negotiations. Even though the LOI was between Martin Marietta and Limerock Industries alone, White Construction was also named as a party to the final contracts.

With permission from White Construction and Limerock Industries, Martin Marietta also initiated contact with the three quarries to begin lease negotiations. On November 1, 2001, Martin Marietta's Manager of Business Development, Charles E. Burnell, Jr., wrote to the owner of the O'Neal Quarry, Gary O'Neal, to begin negotiations. On December 21,

2001, O'Neal's attorney, David MacKay wrote to Martin Marietta stating that: (1) O'Neal would not enter into a lease with Martin Marietta; (2) O'Neal was concerned that White Construction had previously exceeded the boundaries of its existing lease; and (3) White Construction had not been properly accounting for previously mined materials.

Martin Marietta wrote back to MacKay on January 7, 2002, urging O'Neal to reconsider its decision with respect to a lease with Martin Marietta. The letter further stated that if negotiations did go forward, Martin Marietta would require a lease of longer duration, and for a more definite term, than the existing lease between O'Neal and White Construction. On January 22, 2002, MacKay responded, reiterating that O'Neal would not enter into a new lease, but offered Martin Marietta the option of assuming the remaining term of the existing lease with White Construction. By letter dated January 28, 2002, Martin Marietta began discussions with O'Neal about assuming the existing White Construction lease, and sought assurances from O'Neal that he did not consider the existing lease to already be in default. It is not clear the extent to which communications continued between Martin Marietta and O'Neal from this point forward. What is undisputed is that Martin Marietta never obtained a new lease arrangement for the O'Neal Quarry.[6]

---

[6]M. Guy Brooks, III, Martin Marietta's then-Associate General Counsel, explained that Martin Marietta tabled its negotiations with O'Neal in order to focus on the Clifton site. Martin Marietta intended to combine the mining operations of both the O'Neal and Clifton Quarries, and realized that if it could not obtain a satisfactory lease with the Clifton owners, then the O'Neal quarry would be of no use. See Second Declaration of M. Guy Brooks III (Doc. 81, p. 4).

On October 24, 2001, Burnell wrote to Dock Blanchard, attorney for the Clifton family, regarding a new proposed lease for the Clifton Quarry. After speaking with Blanchard on the phone, Burnell sent him a second letter dated November 5, 2001, which made clear that Martin Marietta was interested in a long-term lease of at least ten years, with the option to extend the lease for four additional terms of five years each. In early December 2001, Burnell and M. Guy Brooks, III, Martin Marietta's then-Associate General Counsel, met with the Clifton family and with Blanchard to discuss the lease. On December 14, 2001, Martin Marietta e-mailed a draft lease to Blanchard.

It appears that communications ceased for several months between Blanchard and Martin Marietta, and Martin Marietta never received a formal response to its draft lease. Contact was reestablished at some point and on June 28, 2002, Brooks sent another draft lease to Blanchard. In an attached email, Brooks explained to Blanchard that given White Construction's and Luther White, Sr.'s legal problems, Martin Marietta had not effectuated a purchase of the mining operations, and Martin Marietta was unsure whether White Construction would ever be able to transfer assets to Martin Marietta free and clear of liens. (Doc. 81-12, p. 2). Brooks further explained that Martin Marietta was currently in discussions with White Construction to operate some of the sites, including the Clifton Quarry, whereby Martin Marietta would sublease the sites back to White Construction and/or Limerock Industries to conduct actual mining operations. Id. Brooks made clear to Blanchard that no matter what arrangement Martin Marietta worked out with White

Construction and Limerock Industries, Martin Marietta would remain obligated directly to the Clifton family on any lease they executed. <u>Id.</u>

The Clifton family rejected the draft lease, and Martin Marietta attempted to communicate with Blanchard over the next several months. It appears that negotiations stalled because the Clifton family was considering selling part of its land to an organization interested in developing a race track. On November 12, 2002, Burnell wrote to Blanchard seeking again to finalize a long-term lease, explaining that Martin Marietta had been operating at the Clifton site on a month to month basis since July 1, 2002. It appears that the Cliftons were amenable to the revised lease, and Burnell sent Blanchard a final lease proposal on December 4, 2002.

Martin Marietta did not hear back from Blanchard until approximately February 25, 2003. However negotiations stalled again until April 2003. At that time, Martin Marietta learned that the Clifton family was negotiating with other entities who were interested in leasing the quarry. On April 7, 2003, Brooks wrote to Blanchard asking him to update Martin Marietta on whether there was any chance of a lease agreement between the Cliftons and Martin Marietta. Thereafter, Brooks spoke with Blanchard and informed him that Martin Marietta was no longer interested in a long-term lease. Blanchard explained that the Cliftons had received an offer from a third party who would pay a royalty rate of roughly double the rate Martin Marietta offered. On April 14, 2003, Brooks wrote to Blanchard explaining that Martin Marietta could not pay such a high royalty rate, and that Martin Marietta was no longer interested in negotiating with the Cliftons in any respect. On

May 12, 2003, the Clifton family executed a seven-year lease and royalty agreement with Steven Counts, Inc., and Martin Marietta vacated the property later that summer.

IV.    The Cabbage Grove Lease

During this same time, representatives from Foley and Martin Marietta met to discuss the possibility of a lease with Martin Marietta for the Cabbage Grove Quarry. Foley's lease with White Construction and Limerock Industries was scheduled to expire on October 1, 2001, however Foley agreed to extend the lease for an additional six months to April 1, 2002 in order to facilitate negotiations among the various companies.

At some point during this process, Martin Marietta determined that White Construction was also a party to some of the Quarry leases, and that a significant portion of the equipment that was to be sold under the terms of the LOI also was owned by White Construction.[7] Martin Marietta became concerned that the purchase of assets from White Construction could be impacted by the company's on-going criminal proceedings - specifically that there was a risk the State of Florida would seek forfeiture of all or most of White Construction's assets. When Martin Marietta inquired about the seriousness of the

---

[7]There is a dispute concerning exactly when Martin Marietta learned about White Construction's ownership of these leases and assets. The Plaintiffs have submitted evidence that Martin Marietta was aware of White Construction's lease interests well before the execution of the LOI. Martin Marietta, however, contends that it only learned of White Construction's ownership interests during the due diligence process when it examined the quarry leases and conducted a Uniform Commercial Code search on the mining equipment. The Court does not believe that this disputed fact is material to the resolution of the motion for summary judgment.

criminal charges, White Construction repeatedly assured Martin Marietta that the charges would soon be resolved via a settlement with the State.

Martin Marietta also sought the legal advice of a criminal law attorney. Following this consultation, on March 22, 2002, Martin Marietta advised the Plaintiffs that it wished to go forward with the asset purchase, but would not be able to do so before the existing Cabbage Grove lease expired on April 1, 2002.[8] Instead, Martin Marietta insisted that the purchase be put on hold until after White Construction settled all criminal matters, and the risk of forfeiture was eliminated. In response, White acknowledged the risk of forfeiture, but insisted that it was not likely. However, White and Limerock did nothing to assuage Martin Marietta's fears other than provide their own opinions on the matter. They also rejected Martin Marietta's suggestion that White ask the State of Florida for an assurance that the assets sold to Martin Marietta would not be subject to criminal forfeiture.

White Construction and Limerock Industries contend that it was their intent to either renew their lease with Foley, or to sell their mining operations to a third party, if Martin Marietta was not going to purchase their assets.[9] Martin Marietta represented to the Plaintiffs that it would still go through with the asset purchase contemplated by the LOI once White Construction's criminal proceedings were resolved. Martin Marietta also

---

[8]There is some evidence that the issue of forfeiture was raised between the Parties at earlier points in the negotiation process, but it is undisputed that Martin Marietta did not tell White Construction and Limerock that it could not close on the final contracts until March 22, 2002.

[9]Although this was White and Limerock's intention, there is some evidence that Foley would have been reluctant to renew its lease with them, given White's ongoing criminal proceedings. See Deposition of Dennis Carey, dated July 27, 2006 (Doc. 82-9, pp. 129-131, 155).

proposed that it execute a lease with Foley for Cabbage Grove, effective April 2, 2002, with the understanding that Martin Marietta's acquisition of White Construction's and Limerock Industries' assets would hopefully proceed once the criminal proceedings concluded.

Based on Martin Marietta's representations that it would go forward with the asset purchase once the criminal proceedings were settled, on April 1, 2002, White Construction, Limerock Industries, and Foley entered into an Extension of Mining Agreement, which extended White Construction's and Limerock Industries' Cabbage Grove lease on a day-to-day-basis. The purpose of this agreement was to allow Foley and Martin Marietta sufficient time to negotiate and execute a lease on the quarry. The next day, the Plaintiffs executed an Agreement Regarding Termination of Mining Agreement (the "Termination Agreement"), which immediately terminated their lease with Foley for Cabbage Grove.[10] The Termination Agreement also extinguished the Plaintiffs' rights of removal, which provided both companies the right to remain on the Cabbage Grove property for up to 24 months in order to remove their equipment and materials.[11]

---

[10]The Plaintiffs contend that Foley would not have entered into the lease with Martin Marietta until the Plaintiffs first terminated their lease and all related rights. However, Dennis Carey, Foley's Senior Vice President, testified at his deposition that Foley would have entered into a lease with Martin Marietta regardless of whether the Plaintiffs had executed the Termination Agreement. See Deposition of Dennis Carey, dated July 27, 2006 (Doc. 82-8, pp. 94-95; Doc. 82-9, p. 141). James Sherwin Odom, Foley's former Woodlands Manager, also opined that Foley would have gone forward without a Termination Agreement. Deposition of James Sherwin Odom, dated November 15, 2006 (Doc. 82-10, pp. 77-78, Doc. 82-11, p. 136).

[11]This right of removal was extremely valuable as it made it virtually impossible for any future lessee to conduct mining operations at the quarry while the Plaintiffs' equipment and materials remained at the location. This provision operated as an inducement to the landowner

(continued...)

Immediately after execution of the Termination Agreement, Martin Marietta and Foley entered into a lease for Cabbage Grove, which included minimum annual royalty payments to Foley in the amount of $560,000, regardless of the amount of product mined. Soon thereafter Martin Marietta, White Construction and Limerock Industries entered into a sublease agreement whereby the Plaintiffs continued to conduct mining operations at the quarry on a month-to-month basis in exchange for paying Martin Marietta a royalty fee that was substantially equal to the amount Martin Marietta was obligated to pay to Foley.

V.    The Mining Services Agreement

Despite White Construction's representations in early 2002, the company was not able to obtain a quick settlement of its criminal charges, and the ongoing proceedings were having a detrimental effect on White Construction's financial status. From 2000 through 2002, White was forced to liquidate over $8 million in assets in order to pay mounting legal bills, stay financially afloat, and potentially cover any future assessed criminal penalties.[12] White also put its entire business up for sale, and while several entities expressed interest, White was unable to find a buyer.

Against this backdrop, White Construction and Martin Marietta began negotiations for a separate contract, which would provide Martin Marietta with additional mining rights,

_____

[11](...continued)
to renew its leases with the Plaintiffs in order to avoid a potentially vacant quarry.

[12]At this time, the State of Florida was requesting approximately $ 9,250,000 as a settlement of the criminal claims against White.

14

while also providing the Plaintiffs with an infusion of cash.[13]  The Parties ultimately created

a lengthy and detailed written contract whereby Martin Marietta would provide the Plaintiffs

cash payments in exchange for various mining rights.  This Mining Services Agreement

("MSA") was executed on July 17, 2002, between Martin Marietta's wholly-owned

subsidiary, Martin Marietta Florida, White Construction, Limerock Industries, Luther White,

Sr., and Juanita M. White.[14]  The MSA provides that the Plaintiffs wished to modernize and

expand their mining businesses and obtain a larger distribution network for their products,

and that Martin Marietta was willing to enter into an arrangement with them to do so, "but

only on the condition that Martin Marietta have exclusive control of all activities relating to

the production, sale, and marketing of such products."  (Doc. 44-11, p. 1).

The MSA granted Martin Marietta a sublease for each of the three quarries, as well

as the right to enter the quarries, to conduct all mining operations, to use all equipment

currently located at each quarry, and to market and sell all mined materials.  (Doc. 44-11,

pp. 2-3, 6, 17 ).  Martin Marietta obtained "absolute discretion and control regarding all

aspects of the operations which it conducts" at the quarries, including the right to relocate

---

[13]Martin Marietta contends that the contract came about when Luther White Sr. contacted
Martin Marietta and asked for some financial assistance.  The Plaintiffs, however, insist that it was
Martin Marietta who first brought up the idea of another contract.

[14]Although Martin Marietta Florida is listed in the body of the MSA, the contract was signed
by Martin Marietta Materials, Inc., as the "Manager and Member" of Martin Marietta Florida.  It is
undisputed that Martin Marietta Materials, Inc., is the "sole member" of Martin Marietta Florida, and
that Martin Marietta Florida is a wholly-owned subsidiary of Martin Marietta.  See Doc. 2, Exh. 1.
Therefore, the Court will consider both Martin Marietta Florida and Martin Marietta Materials, Inc.,
to be parties to the MSA.

equipment between quarries, and to modernize and replace existing equipment and related facilities. (Id., pp. 3-4). In the event Martin Marietta decided to release certain equipment from use, (because repairs exceed $1,000 or the equipment had little or no commercial value) the Plaintiffs had twelve (12) months to remove the equipment from a designated storage area. Failure to do so afforded Martin Marietta the right to sell the equipment and distribute the net proceeds to the Plaintiffs, or to cannibalize the equipment for parts. (Id.)

In exchange for these rights, Martin Marietta agreed to make several payments to White Construction and Limerock Industries. At the time of the execution of the MSA, Martin Marietta paid to the Plaintiffs approximately $ 2,900,000 in cash for the existing stockpiled limerock inventory, a seven year non-compete agreement executed by the Plaintiffs, and the accrued "goodwill" in both companies. Martin Marietta also agreed to make monthly royalty payments to the Plaintiffs based on the amount of inventory sold and removed from each quarry for the life of the contract. If the total aggregate monthly royalty payments reached $ 3,000,000 before the expiration of the MSA, Martin Marietta would continue to make monthly payments to the Plaintiffs at the lower amount of $.33 per ton of materials sold and removed from the quarries each month. (Doc. 44-11, p. 9).[15]

Clearly contemplating the risk of asset forfeiture, the Parties also included a provision in the MSA agreeing that if either White Construction or Limerock Industries

---

[15]The Plaintiffs contend that the $3,000,000 amount represented almost the exact amount of interest on the difference between the amounts paid to White Construction and Limerock Industries under the MSA, (roughly $6,000,000) and what Martin Marietta would be obligated to pay for the assets under the LOI ($15,500,000).

> suffer a forfeiture judgment under Florida law in connection with the allegations arising under the [Indictment filed against White Construction and other individuals] or any similar or related criminal or civil charges, they will, pursuant to Section 932.703 of the Florida Statutes, or comparable statutes that may be applicable, seek to satisfy that judgment by forfeiting assets other than any assets purchased by Martin Marietta, or to be utilized by Martin Marietta, pursuant to this Agreement.

(Doc. 44-11, p. 13).

One of the most important terms of the MSA was the "option to purchase" provision. Contrary to the terms of the LOI, which obligated Martin Marietta to purchase the Plaintiffs' mining equipment and related assets for $15.5 million, the MSA provided Martin Marietta with the option to purchase these items at their fair market value. (Doc. 44-11, p. 20). Martin Marietta could exercise its option rights at any time prior to the end of the MSA's term, and upon written notice to the Plaintiffs. Once the Parties determined the fair market value, Martin Marietta would be entitled to a credit against the purchase price for all payments previously made to buy White Construction's and Limerock Industries' preexisting inventory, non-compete agreement, and goodwill. During the term of the MSA, the Plaintiffs agreed not to negotiate with any third parties for the sale of their assets and equipment, and agreed to give Martin Marietta a thirty day right of first refusal, should a third party make an unsolicited bona fide offer for the items. (Id.).

The Parties further agreed that the MSA would expire on the earlier date of: (1) when Martin Marietta had removed all extractable limerock; (2) when the last mining lease expired; or (3) when Martin Marietta exercised its option to purchase the Plaintiffs'

remaining assets. (Id., p. 17). Martin Marietta also had the complete discretion to terminate the Agreement at any earlier date, upon 90 days written notice. (Id.).

The MSA also contained the following merger and integration clause:

> Section 8.3 Entire Agreement; Amendment; Waiver, Severability. This Agreement shall be deemed to have incorporated by reference all of the exhibits referred to herein to the same extent as if they were fully set forth herein. Each reference herein to "the Agreement " or "this Agreement' shall be construed to include each such exhibit. This Agreement and the schedule and exhibits attached hereto represent the entire understanding and agreement between the parties with respect to the subject matter hereof and supersede any prior agreements and understandings between the parties with respect to that subject matter. This Agreement may not be amended or modified except by a written instrument executed by an officer of [Martin Marietta Florida] and the Designated Representative.

(Doc. 44-11, p. 22).[16]

White Construction and Limerock Industries were initially opposed to the option to purchase provision, and explained to Martin Marietta that this term was contrary to the LOI's provisions which mandated that Martin Marietta buy these assets for $15.5 million. In response, Guy Brooks and Charles Burnell of Martin Marietta made it clear that this was the only arrangement it could make at this point in time, and that Martin Marietta's

---

[16]The MSA also contains a provision mandating that all disputes concerning the contract, including its formation and performance of its terms, shall be resolved exclusively by arbitration in Tallahassee, Florida. (Doc. 44-11, p. 16). It is clear, however, that the Parties have waived this provision - neither side has raised the issue of arbitration at any point in this litigation, the MSA itself contemplates that a party may grant a waiver of any provision of the Agreement, and the Plaintiffs allege in their Third Amended Complaint that all conditions precedent have been satisfied, or were waived by the Defendants. See Doc. 44, ¶ 46; Doc. 44-11, p. 22. See also Ivax Corp. v. B. Braun of Am., Inc., 286 F.3d 1309, 1315 (11th Cir. 2002); Morewitz v. West End of England Ship Owners Mut. Prot. & Indem. Ass'n, 62 F.3d 1356, 1366 (11th Cir. 1995).

attorneys required the addition of the option to purchase provision in the MSA in order to insulate the company from any forfeiture risks.

White Construction and Limerock Industries contend that Martin Marietta also repeatedly assured them that the MSA was merely an interim agreement that would cease to exist once the criminal proceedings ended, and that Martin Marietta would then close on its purchase of the mining operations and assets under the terms set forth in the LOI. White Construction and Limerock Industries further represent that they relied heavily on these statements when deciding to enter into the MSA. Martin Marietta, however, contends that it never made any such statements, but instead told the companies that if White Construction could settle its criminal proceedings, that Martin Marietta hoped it could negotiate a future purchase of the assets under new terms. It is undisputed, however, that the negotiations for the MSA were conducted at arms-length, with legal representation on both sides.

IV.    Post MSA Events

Martin Marietta, White and Limerock operated under the terms of the MSA without incident for two years. On July 16, 2003, after it was clear that Martin Marietta was not going to be able to obtain new leases on the Clifton and O'Neal sites, representatives from Martin Marietta met in Gainesville, Florida, with Luther White. Sr., Stephen Pomeroy, Comptroller of White Construction, and Stan Cushman, attorney for White Construction and Limerock Industries. During the meeting, the Parties discussed the impact of the two

expired mining leases on the continued viability of the MSA.[17]  It was the Plaintiffs' position that without the Clifton and O'Neal leases, the original intent of the MSA could no longer be satisfied.  In a letter dated July 24, 2003, Cushman wrote to Brooks, asking whether, in light of these changed circumstances, Martin Marietta would be willing to renegotiate the MSA.  (Doc. 99-13).

Brooks responded by letter dated August 1, 2003.  (Doc. 99-14).  In the letter, Brooks emphasized Martin Marietta's rights under the MSA to operate and relocate all equipment at the Clifton and O'Neal quarries, and reminded Cushman that Martin Marietta intended to relocate the equipment to the Cabbage Grove site.  Brooks also specified to Cushman that the deal contemplated in the LOI did not go through because of White Construction's pending criminal matters, and that the Parties instead negotiated and executed the MSA.  With respect to the MSA, Brooks stated that the option to purchase the remaining assets at the three quarries "was, and is, merely an option, and not an obligation, of Martin Marietta to purchase these remaining assets.  Of course, as time goes by, these assets have become fewer and fewer as equipment has aged, etc."  (Doc. 99-14, p. 2).

Brooks also made clear to Cushman that the loss of the Clifton and O'Neal mining leases did not change the intent or operation of the MSA because the Cabbage Grove assets and quarry were always the main focus of Martin Marietta and the MSA.  Brooks also expressed the opinion that Martin Marietta did not "lose" either of the two leases -

---

[17]The Parties also discussed the impact on the non-compete agreement, as well as their joint obligations to move all equipment from the Clifton quarry to the Cabbage Grove quarry.

rather, the leases merely expired under their original terms when the owners of both quarries refused to do business with Martin Marietta. Brooks closed his letter by stating that Martin Marietta believed that the original intent of the MSA has been and continues to be met, but that Martin Marietta would be open to entertaining any proposals the Plaintiffs came up with. A copy of the letter was sent to Luther White, Sr. and Steven Pomeroy.

It does not appear that the Parties engaged in any negotiations to revise the MSA. On July 14, 2004, Luther White Sr. notified Martin Marietta that the criminal proceedings against White Construction had been settled, and that both White Construction and Limerock Industries wished to go forward with Martin Marietta's purchase of their assets under the terms and conditions set forth in the LOI.[18] By this time, however, conditions had changed - in addition to the expired leases on the Clifton and O'Neal Quarries, the company had lost the ability to sell limerock to White Construction, (a potentially significant customer), due to the fact that White Construction was now barred from any road construction work in Florida, and the value of the assets which were the focus of the LOI had depreciated in value. As a result, Martin Marietta refused to go forward with the asset purchase, and White Construction and Limerock Industries initiated this action.

---

[18]The final plea agreement between White and the State of Florida included a payment of just over $1 million as a criminal penalty, and a thirty (30) year ban from any further road construction projects with the Florida Department of Transportation. See Deposition of Stephen Pomeroy, dated April 26-27, 2006 (Doc. 82-17, p. 372-73, Exhibit 74).

## Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party." Samples on Behalf of Samples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." Rollins v. Techsouth, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

## Discussion

The Plaintiffs' Third Amended Complaint consists of twelve state law claims alleged against both Defendants: (1) Count I - breach of contract for breach of the LOI; (2) Count II - breach of fiduciary duty; (3) Count III - fraud in the inducement regarding the MSA; (4) Count IV - breach of the Defendants' implied duty of good faith and fair dealing with respect to the MSA; (5) Count V - breach of contract for breach of the MSA; (6) Count VI - unjust

22

enrichment; (7) Count VII - promissory estoppel; (8) Count VIII - quantum meruit; (9) Count IX - breach of oral contract regarding the Cabbage Grove Termination Agreement; (10) Count X - fraud in the inducement regarding the Termination Agreement; (11) Count XI - tortious interference with an advantageous business relationship; and (12) Count XII - civil theft. The Parties agree that Florida law applies to each count, and the Defendants have moved for summary judgment on all claims.

## I.     Count One: Breach of Contract - The Letter of Intent

Count I of the Third Amended Complaint is a breach of contract claim focusing on the LOI. The Plaintiffs allege that the LOI is a binding and enforceable contract, either by its plain terms or by the subsequent actions of all Parties, that they partially performed under the LOI when they facilitated Martin Marietta's negotiation of a lease with Foley, and that Martin Marietta breached the LOI when it failed to purchase the assets listed in the LOI for $15.5 million. (Doc. 44, ¶¶ 48-56).

It is clear that Martin Marietta never purchased the Plaintffs' assets for $15.5 million, therefore there is no real question on the issue of a breach. This claim instead rests solely on a determination of whether or not the LOI, which by its very terms states that it is not a binding or enforceable contract, can, in fact, be deemed as such. Based on the applicable law and the undisputed facts of this case, the Court concludes that it cannot.

Both sides first focus on the terms of the LOI itself - specifically the level of detail contained in the letter. Martin Marietta argues that the LOI was preliminary in nature and

did not contain certain definitive contract terms, while White Construction and Limerock Industries contend that all essential terms were set forth in the LOI.

By focusing on the level of specificity required to create a contract, the Parties ignore the primary, threshold issue concerning whether the Parties intended for the LOI to create a binding legal obligation. Unless the Parties intended to be bound by the LOI, they did not enter into a contract to pursue the contemplated sale of the mining equipment and assets, regardless of the level of detail set forth in the LOI. Doll v. Grand Union Co., 925 F.2d 1363 (11th Cir. 1991). As explained by the Eleventh Circuit in Doll:

> Every possible provision of a contemplated [contract] may be discussed and agreed upon, but unless the parties intend that these discussions be binding, no contract has been formed. When the parties express their intention to be bound and they specify the basic terms of the lease, the courts will enforce the contract, . . . to avoid frustrating the parties' original intent. When such indications of intent are absent or are explicitly disavowed, however, the justification for enforcing the proposed [contract] is wholly absent. The court does not address the terms of the proposed [contract] until it has satisfied itself that the parties did indeed intend to be bound.

Id. at 1368-69.

The question of whether the Parties intended to form a binding contract is determined by examining the language of the LOI, as well as the surrounding circumstances. Midtown Realty, Inc. v. Hussain, 712 So. 2d 1249, 1251-52 (Fla. 3d DCA 1998). In this case, the document in question, the LOI, literally does nothing more than set forth an agreement to agree in the future, pending the outcome of various negotiations, due diligence investigations, and other conditions precedent, including the creation of a more detailed

"definitive contract." In fact, the LOI goes so far as to provide that any party "may terminate this letter of intent or the negotiations resulting from it, merely by giving written notice to the other." (Doc. 44-2, p. 5). Further, the very first page of the LOI specifically and expressly disavows any intent to be bound or to create any legal obligation to conclude the asset purchase transaction under any terms or conditions, short of execution of a legally binding agreement, (Id., p. 1). This falls far short of an enforceable contract. See Ocala Cooperage Co. v. Florida Cooperage Co., 52 So. 13 (1910) ("but where it appears that the parties, or either of them, intended that the contract should be reduced to writing, so that its terms would be fully understood and definitely stated in the writing, the contract will not be regarded as complete or binding until it is reduced to writing and acquiesced by both parties."); Club Eden Roc, Inc. v. Tripmasters, Inc., 471 So. 2d 1322, 1324 (Fla. 3d DCA 1985) ("Where the parties intend that there will be no binding contract until the negotiations are reduced to a formal writing, there is no contract until that time."). Cf. Citizens Bank of Perry v. Harlie Lynch Construction Co., 426 So. 52 (Fla. 1st DCA 1983) (court looked at terms of the written documents to see if there was any language evidencing an intent not to be bound, in the absence of such language, documents created an enforceable contract).

White Construction and Limerock Industries, however, contend that the actions of all Parties following the creation of the LOI evidence an intent to be bound, and transformed what was originally a non-binding document into an enforceable contract. See Lifecare International, Inc. v. CD Medical, Inc., 68 F.3d 429, 436 (11th Cir. 1995) ("Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not

denote that they did not intend to be bound immediately by their oral or written negotiations."); Eastern Air Lines, Inc. v. Mobil Oil Corp., 564 F.Supp. 1131, 1145 (S. D. Fla.1983) ("If parties so intend, a contract is binding from the time it is made even though the parties also agree that a formal writing embodying its provisions will subsequently be prepared."). They point to the following events: (1) the Plaintiffs partially performed under the LOI by terminating their lease rights for the Cabbage Grove quarry, thereby facilitating the negotiation of the Cabbage Grove lease in Martin Marietta's own name; (2) Martin Marietta accepted the Plaintiffs' performance by executing a lease for Cabbage Grove; (3) Martin Marietta repeatedly promised it would go forward with the asset purchase transaction once White Construction's criminal proceedings were resolved; (4) Martin Marietta represented to the owners of the Clifton and O'Neal quarries that White Construction and Limerock Industries had agreed to sell their mining equipment and assets to Martin Marietta;[19] (5) Martin Marietta prepared agreements and instruments contemplated by the LOI; and (6) the LOI prohibited Limerock Industries from negotiating with third parties for the sale of its assets and mining equipment from September 27, 2001 through March 1, 2002.

The Court concludes, as a matter of law, that these events cannot defeat the parties' clear and unambiguous expression of their intent not to be bound in the absence of a formal written agreement. The LOI makes clear that the Parties contemplated future negotiations leading to a formal written contract, and the circumstances the Plaintiffs point to do not

---

[19]See Docs. 44-4, 44-5.

change this fact. The statements by Martin Marietta to the owners of the Clifton and O'Neal Quarries do not state that a contract has been entered into - only that White Construction and Limerock Industries have agreed to sell some of their assets - and do not contradict the plain terms of the LOI. Moreover, the Plaintiffs' reference to Martin Marietta's preparation of various agreements and instruments contemplated by the LOI only reinforces its non-binding nature - it is undisputed that numerous drafts of an asset purchase agreement were sent back and forth between the Parties over the months following the creation of the LOI. See LaFarge North America, Inc. v. Matraco Colorado, Inc., No. 07-80112-CIV, 2008 WL 2277503 (S.D. Fla. May 30, 2008) (holding that numerous oral communications, commitment of substantial time and financial resources, including payment of advance management fee of $200,000, as well as counter-defendant's frequent reference to counter-plaintiff as its "partner," do not create an inference of a binding agreement, where a letter of intent exists clearly stating that it is not binding).

The Plaintiffs' reliance on Martin Marietta's oral promises to go forward with the sale once the criminal proceedings were resolved also does not change the meaning and enforceability of the LOI. These promises were purely conditional in nature, and once again reinforce that there was no binding agreement. It is undisputed that Martin Marietta would not complete the purchase transaction unless and until White Construction's criminal proceedings concluded, and the risk of forfeiture ceased to exist. Until these conditions precedent occurred, no deal would be consummated, and therefore there was no intent to be bound. See Doll, 925 F.2d at 1367-69 (promises by defendant that it had every intention

of finalizing a lease once it was drafted, approved and signed by both parties was conditional in nature and did not make letter of intent a binding contract).

White Construction's and Limerock Industries' claims of partial performance also do not make the LOI a binding contract in light of the express terms of the LOI stating that the Parties did not intent to be bound until after due diligence was completed and a definitive contract was executed.  See Club Eden Roc, 471 So. 2d at 1323-24 (alleged partial payment based on memorandum of intent did not create binding contract where memorandum was clear that no rights or obligations would arise until the execution of an agreement containing all terms and conditions); Doll, 925 F.2d at 1363-69 (actions taken in reliance on letter of intent as well as oral expressions of intent to complete transaction, did not make letter binding and enforceable where parties expressed clear intent not to be bound absent formal written document); LaFarge North America, Inc. 2008 WL 2277503 at * 5 (same).[20]  Further, it is undisputed that this "partial performance" did not take place until April 1, 2002, well after the LOI expired by its own terms, and after Martin Marietta made

_____

[20]White Construction and Limerock Industries also rely on the fact that the LOI contained a provision precluding Limerock Industries from negotiating with other parties to sell their assets until March 1, 2002.  Again, this provision does not render the LOI a binding contract.  By its own terms, it is clear that this provision was simply meant to provide some assurances to Martin Marietta before it incurred the costs and expenses in performing its due diligence review.  (Doc. 44-2, p. 5).  The LOI also makes clear that, notwithstanding this limitation on Limerock's negotiations, all other provisions in the LOI, in particular Martin Marietta's purchase of the mining equipment and assets, did not create any legal obligations upon any party.  (Id., p. 1).

clear that it would not finalize the deal until White Construction's criminal proceedings concluded.[21]

There is also evidence in the record suggesting that the Plaintiffs understood that the LOI was not enforceable. Stephen Pomeroy testified at his deposition that the LOI was non-binding on either party, was "just one step in the total relationship that was both oral and written," and did not fully reflect the intent of the parties in terms of what they had agreed to.[22] Pomeroy further testified that during the course of White Construction's settlement discussions with the State of Florida, White Construction deliberately did not mention Martin Marietta's future purchase of the mining equipment and assets because "[w]e didn't have a contract," but only had a letter of intent.[23] In addition, John Reid, legal counsel for both Plaintiffs, and the attorney who assisted in the drafting and execution of the MSA, testified that the LOI was a nonbinding document that was intended to be followed by a definitive contract.[24] The Court is also persuaded by the fact that the proposal set forth in the LOI dealt with the sale of mining assets and the operation of mining facilities at various quarries, a complex situation that includes environmental concerns, the attainment of licenses and contracts with third parties, and the exchange of a large sum of money, among other things.

---

[21]The LOI contemplated a closing date of March 1, 2002. (Doc. 44-2, p. 4).

[22]Deposition of Stephen J. Pomeroy, dated April 26-27, 2006 (Doc. 82-13, p. 110, Doc. 82-14, p. 174).

[23]Continuation of Deposition of Stephen J. Pomeroy, dated August 4, 2006 (Doc. 82-16, pp. 350-51).

[24]Deposition of John Reid, dated July 6, 2006 (Doc. 98-2, pp. 23-24).

Under these circumstances, it is more than reasonable to conclude that the Parties did not intend to be bound by the LOI.  See <u>Midtown Realty</u>, 712 So. 2d at 1252; <u>LaFarge North America</u>, 2008 WL 2277503 at * 5.

Even if the Court were to conclude that these circumstances demonstrated a mutual intent to be bound by the terms of the LOI (or at least created a genuine issue of material fact), there is one other subsequent event which defeats the Plaintiffs' claim.   On July 17, 2002, the Parties entered into a comprehensive, detailed, and enforceable written agreement, which expressly covers Martin Marietta's operation of the three quarries, as well as its purchase of the mining assets - the same transactions contemplated under the terms of the LOI.  For example, the MSA provides that Martin Marietta now has the option to purchase these assets and equipment, at their fair market value, at some future point in time, and at Martin Marietta's discretion.  The MSA also provides that Martin Marietta has the complete discretion and authority to operate the mining facilities at each of the three quarries, including the use, repair, and replacement of the equipment at each quarry.

These express terms, which were the product of an arms-length negotiation process with legal representation on both sides, are valid, enforceable, and discharge any claims based on the LOI.  More importantly, the MSA contains a merger and integration clause specifically providing that all prior agreements and understanding concerning the subject matter of the MSA are superseded by the MSA itself.  See <u>Aly Handbags, Inc. v. Rosenfeld</u>, 334 So.2d 124, 126 (Fla. 3d DCA 1976) ("The well established rule of law is that a contract may be discharged or extinguished by merger into a later contract entered into between the

parties in respect to the same subject which replaces the original contract."). See also In re Estate of Shore, 605 So. 2d 951 (Fla. 4th DCA 1992); Topp, Inc. v. Uniden American Corp., 483 F. Supp. 2d 1187, 1218-19 (S.D. Fla. 2007).

Summary judgment shall be granted as to Count I.

II.     Count Two:  Breach of Fiduciary Duty

The Plaintiffs' second claim is based on a theory that a fiduciary relationship was created between the Parties when they executed the MSA.  (Doc. 44, ¶¶ 58-60).[25]  More specifically, White Construction and Limerock Industries contend that pursuant to the MSA, Martin Marietta assumed managerial duties for all three quarries, thereby creating a fiduciary duty to perform its management functions so that the Plaintiffs would not be harmed, and breached its duties by:  (1) failing to negotiate new leases for the Clifton and O'Neal quarries; and (2) failing to appropriately operate, repair, and maintain the mining equipment at these quarries.  (Doc. 101, pp. 14-15).

"A fiduciary relationship is based on trust and confidence between the parties where 'confidence is reposed by one party and a trust accepted by the other ...'." Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So.2d 536, 540 (Fla. 5th DCA 2003)(quoting Quinn v. Phillips, 113 So. 419, 421 (1927)); see also Doe v. Evans, 814 So. 2d 370, 374 (Fla. 2002).  To state a claim for breach of a fiduciary relationship, "a party must allege some

_____

[25]The Plaintiffs also alleged the existence of a fiduciary duty by virtue of Martin Marietta's execution of a lease for Cabbage Grove.  The Plaintiffs have abandoned this portion of their claim in their response in opposition.

degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." <u>Watkins v. NCNB Nat. Bank of Fla., N.A.</u>, 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quoting <u>Bankest Imports, Inc. v. ISCA Corp.</u>, 717 F. Supp. 1537 1541 (S.D. Fla. 1989)). "The fact that one party places trust or confidence in the other does not create a confidential [or fiduciary] relationship in the absence of some recognition, acceptance or undertaking of the duties of a fiduciary on the part of the other party." <u>American Honda Motor Co., Inc. v. Motorcycle Information Network, Inc.</u>, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005).

White Construction and Limerock Industries can establish a fiduciary relationship either by demonstrating the existence of an express contract or submitting facts upon which such a relationship can be implied in law. It is undisputed that there is no express contract creating a fiduciary relationship between the Parties. And there is also no material issue of fact concerning the existence of an implied in law relationship.

White Construction and Limerock Industries hang their hat on the MSA itself, arguing that its terms created a fiduciary relationship. However, there is nothing in the MSA that makes Martin Marietta a fiduciary of either company, nor is there anything in the contract demonstrating a placement of the Plaintiffs' confidence in Martin Marietta and/or Martin Marietta's acceptance of their trust. There is also no evidence before the Court establishing that the Plaintiffs were the weaker parties during the creation of the MSA, and/or dependent

on Martin Marietta to advise, counsel, or protect them.[26]  To the contrary, it is undisputed that all negotiations concerning the formation and execution of the MSA were conducted at arms-length, with each company utilizing the advice of its own legal counsel.[27]  "When parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."  Taylor Woodrow Homes, 850 So. 2d at 541.  See also Argonaut Development Group, Inc. v. SWH Funding Corp., 150 F. Supp. 2d 1357, 1363 (S.D. Fla. 2001) ("there is no case law which suggests a fiduciary duty arises between arms-length parties to a proposed contract.").

White Construction and Limerock Industries attempt to avoid the arms-length issue by arguing that "[w]hile the parties may have been dealing at arms length 'when they entered into' the MSA, the fiduciary duty arose thereafter precisely by virtue of the terms of the MSA and the nature of the relationship of the parties."  (Doc. 101, p. 15).  In other words, the Plaintiffs admit that the fiduciary relationship is contract-based.[28]  It is the law of Florida that "a cause of action for breach of fiduciary duty will not lie where the claim of breach is dependent upon the existence of a contractual relationship between the parties

---

[26]The fact that Martin Marietta stands in a position of greater bargaining power by virtue of its national economic status is not sufficient by itself to impose a fiduciary obligation on either Plaintiff.  See Cripe v. Atlantic First Nat. Bank of Daytona Beach, 422 So. 2d 820, 823 (Fla. 1982).

[27]See Deposition of Stephen Pomeroy, dated November 11, 2006 (Doc. 82-22, pp. 74-76).

[28]Indeed, the Plaintiffs entitle this section of their opposition brief "Defendants breached their fiduciary duties under the MSA."  (Doc. 101, p. 15).  It also bears noting that the breaches alleged in this claim are identical to the alleged breaches of the MSA set forth in the Plaintiff's breach of contract claim (Count V).

. . . . This is true because the duty is owed only as a result of the existence of the contract." Excess Risk Underwriters, Inc. v. Lafayette Life Ins. Co., 208 F. Supp. 2d 1310, 1316 (S.D. Fla. 2002). See also Detwiler v. Bank of Central Florida, 736 So. 2d 757, 759 (Fla. 5th DCA 1999); Greenfeld v. Manor Care, Inc., 705 So. 2d 926, 932 (Fla. 4th DCA 1997). Because it is undisputed that Martin Marietta's alleged fiduciary relationship with White Construction and Limerock Industries is necessarily dependent on the contractual relationship between the parties, summary judgment is appropriate on this claim.[29]

III.     Count Three:  Fraud in the Inducement - The Mining Services Agreement

The Plaintiffs' third claim alleges that Martin Marietta fraudulently induced them to enter into the MSA: (1) when Martin Marietta falsely represented that the MSA was only an interim agreement until White Construction's criminal proceedings ended, at which time Martin Marietta would purchase the remaining assets under the terms of the LOI; and (2) when Martin Marietta falsely stated it would properly manage the Clifton and O'Neal Quarries.  Both Plaintiffs contend that they reasonably relied on these false statements when they entered into the MSA and, as a result, suffered the loss of all three quarries, as well as the revenues they would have generated from the sale of limestone mined from the quarries.  (Doc. 44, ¶¶ 63-67).

---

[29]The Plaintiffs reliance on Maxwell v. First United Bank, 782 So. 2d 931 (Fla. 4th DCA 2001) is unavailing.  That decision merely sets forth the definition of a fiduciary relationship under Florida law, and holds that such a relationship does not exist in an arms-length transaction between a bank and its borrower.  The Plaintiffs have not submitted any other legal authority to support their position that a fiduciary relationship existed in this case.

In order to recover on a claim for fraudulent inducement, a plaintiff must prove by the greater weight of the evidence that: (1) a false statement was made regarding a material fact; (2) the individual who made the statement knew or should have known that it was false; (3) the maker intended that the other party rely on the statement; and (4) the other party justifiably relied on the statement to its detriment. <u>Biscayne Inv. Group, Ltd. v. Guarantee Management</u>, 903 So. 2d 251, 255 (Fla. 3d DCA 2005). <u>See</u> <u>also</u>, <u>Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc.</u>, 162 F.3d 1290, 1315 (11th Cir. 1998) <u>Taylor Woodrow Homes</u>, 850 So. 2d at 542; <u>Lance v. Wade</u>, 457 So. 2d 1008 (Fla. 1984). Martin Marietta challenges the first and fourth elements of this claim.

Martin Marietta first argues that there is no record evidence establishing that it ever unequivocally told White Construction or Limerock Industries that it would purchase their assets for $15.5 million upon the conclusion of White Construction's criminal proceedings if they executed the MSA. Taking all of the facts in the light most favorable to the Plaintiffs, the Court disagrees. White Construction and Limerock Industries have provided deposition testimony from Stephen Pomeroy that Martin Marietta did, in fact, make such a representation. There is also deposition testimony from various Martin Marietta officials that at least some sort of representation concerning the possibility of purchasing the mining equipment and other assets was made prior to the execution of the MSA. This testimony is sufficient to create material issue of fact as to the first element of the Plaintiffs' claim.

Martin Marietta also contends that the Plaintiffs were not justified in their reliance on the alleged misrepresentations. "The law is clear that reliance by a party claiming fraud must be reasonable and justified under the circumstances." Smith v. Mellon Bank, 957 F.2d 856, 858 (11th Cir. 1992). For if the recipient "knows that it [the statement] is false or its falsity is obvious to him," his reliance is improper, and there can be no cause of action for fraudulent misrepresentation. M/I Schottenstein Homes, Inc. v. Azam, 813 So. 2d 91, 94-95 (Fla. 2002) (quoting Besett v. Basnett, 389 So.2d 995, 997 (Fla.1980)). Moreover, "[a] party cannot recover in fraud for alleged oral misrepresentations that are adequately covered or expressly contradicted in a later written contract." Mac-Gray Services, Inc. v. DeGeorge, 913 So. 2d 630, 634 (Fla. 4th DCA 2005). See also Tissuenet Custom Applications LLC v. Blood & Tissue Center of Central Texas, No. 6:05-cv-1931-Orl-31KRS, 2006 WL 1528877 (M.D. Fla. June 1, 2006) (stating same); Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1342 (S. D. Fla. 1999) ("reliance on fraudulent representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement.") (internal citations omitted).

Section 7.13 of the MSA expressly provides that during the term of the Agreement, Martin Marietta shall have the option and right to purchase the assets of White Construction and Limerock Industries at their fair market value. (Doc. 44-11, p. 20). Section 7.6 provides that the term of the MSA shall continue until either (1) Martin Marietta has extracted and removed from each quarry all of the materials which Martin Marietta, in its sole and absolute

discretion determines can be extracted and removed; or (2) the applicable mining lease for each quarry terminates. The MSA further provides that Martin Marietta has the sole right to terminate all or part of the Agreement, at any earlier date, simply upon 90 days written notice. (Doc. 44-11, p. 17). The only reasonable reading of these provisions of the MSA is that Martin Marietta had the sole discretion and authority to determine when the MSA would terminate, as well as if, and when, it would purchase the remaining assets from the Plaintiffs at their fair market value.

Both the duration of the MSA and Martin Marietta's discretion to purchase the assets are specifically addressed in clear terms in the MSA; terms which omit any mention of an obligation on the part of Martin Marietta to purchase the assets at a set price, or to terminate the MSA upon the conclusion of White Construction's criminal proceedings. The alleged oral representations by Martin Marietta that it would terminate the MSA and purchase the equipment and assets for $15.5 million once White Construction resolved its criminal case are thus, at the very least adequately addressed, if not specifically contradicted, by the language of the MSA. Therefore, the Plaintiffs cannot justifiably rely on those representations as a basis for its claim.[30] See Tissuenet Custom Applications, 2006 WL 1528877 at ** 4-5; Zaccaria v. Allstate Ins. Co., No. 97-1637-Civ-T-17E, 1997 WL 875777

---

[30]The Court is further persuaded by the existence of the MSA's merger and integration clause. (Doc. 44-11, Section 8.3, p. 22). In situations where the alleged oral representations are directly contradicted by the written terms of the contract, a merger and integration clause further supports the conclusion that reliance on the oral representations is not justifiable. See Pettinelli v. Danzig, 722 F.2d 706, 710 (11th Cir. 1984); Tissuenet Custom Applications, 2006 WL 1528877 at * 4; Topp, Inc. v. Uniden America Corp., 513 F. Supp. 2d 1345, 1348 (S.D. Fla. 2007).

at ** 3-4 (M.D. Fla. Nov. 14, 1997); <u>Mac-Gray Services</u>, 913 So. 2d at 634; <u>Englezios v. Batmasian</u>, 593 So. 2d 1077, 1078 (Fla. 4th DCA 1992); <u>Topp, Inc. v. Uniden America Corp.</u>, 513 F. Supp. 2d 1345, 1350 (S.D. Fla. 2007).[31]

While not entirely clear, it appears that the Plaintiffs are arguing in the alternative that the terms of the MSA do not contradict the alleged oral representations of Martin Marietta concerning its purchase of the mining equipment and assets, but that the MSA is merely silent on this issue. Although the Court has already determined as matter of law that contradictory language exists, even if the MSA was silent as to Martin Marietta's purchase of the equipment and assets, White Construction's and Limerock Industries' fraudulent inducement claim would still fail. <u>See</u> <u>SEB S.A. v. Sunbeam Corp.</u>, 148 Fed. Appx. 774, 2005 WL 1926418 at * 20 (11th Cir. Aug. 12, 2005) ("Florida law consistently recognizes that a basic tenet of contract law [is] that reliance on representations by a contracting party in a suit based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties.") (citing <u>Barnes v. Burger King Corp.</u>, 932 F. Supp. 1420, 1428 (S.D. Fla. 1996)). <u>See</u> <u>also</u> <u>Cibran Enterprises, Inc. v. BP Products North America, Inc.</u>, 365 F. Supp. 2d 1241, 1253 (S.D. Fla. 2005) (it was unreasonable for the plaintiff to rely on an oral promise when the subsequent written

---

[31]The Plaintiffs argue that their Cabbage Grove lease interests are not covered by the MSA, because Martin Marietta had already entered into a lease with Foley prior to execution of the MSA. This argument fails by the plain terms of the Agreement. Section 1.1 of the MSA defines "The Quarries" to include the Cabbage Grove Quarry, and defines the "Mining Leases" to include Martin Marietta's lease with Foley, and sublease to Limerock. (Doc. 44-11, p. 2).

contract was silent and expressly required that all promises and agreements must be reduced to writing); Eclipse Medical, 262 F. Supp. 2d at 1342 ("Indeed, fraudulent inducement claims will fail even where the subsequent contract simply says nothing about the allegedly false promise."); Schubot v. McDonalds Corp., 757 F. Supp. 1351, 1356 (S.D. Fla. 1990) ("Any reliance on the defendants' alleged misrepresentations is unreasonable because the statements were not contained in the subsequent, written agreement.").

"Courts have also held that a party could not rely justifiably on representations not contained in the contract where the party helped draft the agreement and relinquished opportunities to reduce the representations to writing." SEB S.A., 2005 WL 1926418 at * 2. See also Johnson Enters. of Jacksonville, 162 F.3d at 1315 (affirming judgment as a matter of law against plaintiff claiming fraudulent inducement based on oral representation where plaintiff participated in drafting of subsequent written contract and had the opportunity to add terms he considered essential). This is precisely what happened here. It is undisputed that representatives from White Construction and Limerock Industries participated in the negotiation and drafting of the MSA, and initially objected to the inclusion of the option to purchase provision. Despite these initial objections, as well as Martin Marietta's explicit refusal to include any terms obligating it to purchase the equipment and assets for $15.5 million, White Construction and Limerock Industries executed the MSA, which contained both the option to purchase provision, as well as a clear and express merger clause. See 3 P.M. Inc. v. Basic Four Corp., 591 F. Supp. 1350, 1367 (E.D. Mich. 1984) (Plaintiff's reliance on an oral statement unreasonable after the defendant had

expressly refused to include a similar provision in the contract).  Summary judgment in favor of Martin Marietta is warranted on this claim.[32]

## IV.     Count Four:  Breach of Implied Duty of Good Faith and Fair Dealing

The Plaintiffs' next claim again focuses on the MSA, and alleges that Martin Marietta breached its implied duty of good faith and fair dealing which arose out of the terms of the MSA when Martin Marietta: (1) allowed the Clifton and O'Neal mining leases to expire; and (2) failed to repair and maintain White Construction's and Limerock Industries' mining equipment located at the three quarries.[33]

"Under Florida law, the implied covenant of good faith and fair dealing is a part of every contract."  Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999).  The "duty of good faith must relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements."

---

[32]Although both sides focus their arguments primarily on the asset purchase provisions, it bears noting that the Court's analysis applies with equal force to that portion of the Plaintiffs' claim concerning Martin Marietta's alleged oral promise to properly manage the Clifton and O'Neal Quarries.  It is undisputed that the MSA does not contain any obligations on the part of Martin Marietta to "properly manage" either quarry.  To the contrary, the MSA states that Martin Marietta: (1) has the right to enter the quarries and to take all action permitted under the Mining Leases that Martin Marietta, in its discretion, deems appropriate; and (2) has the absolute discretion and control regarding all aspects of the operations which it conducts at the quarries.  (Doc. 44-11, Sections 1.2, 1.4, pp. 2-3).  Thus, the Plaintiffs' claim would fail either because the MSA was silent on this issue, or because the other terms of the MSA adequately covered the issue.

[33]The Plaintiffs' Third Amended Complaint also alleges that Martin Marietta breached its implied duty when it renewed the Cabbage Grove mining lease in its own name.  However, it appears that the Plaintiffs have abandoned this portion of their claim, and they do not address it in their summary judgment papers.

Hospital Corp. of America v. Florida Med. Ctr., 710 So.2d 573, 575 (Fla. 4th DCA 1998). The Eleventh Circuit has held that "no independent cause of action exists under Florida law for breach of the implied covenant of good faith and fair dealing.  Where a party to a contract has in good faith performed the express terms of the contract, an action for breach of the implied covenant of good faith will not lie."  Weaver, 169 F.3d at 1317-18.  Thus it is clear that in order to maintain a claim for breach of the implied duty of good faith and fair dealing, there must be an express term of the contract that has been breached, and the implied duty cannot vary the terms of the written contract.

The Plaintiffs acknowledge that there are no express provisions in the MSA which require Martin Marietta to renew the Clifton and O'Neal mining leases.  This alone is sufficient to justify the granting of summary judgment as to this portion of their claim.  See Johnson Enterprises, 162 F.3d at 1314 ("The good faith requirement does not exist 'in the air.'  Rather, it attaches only to the performance of a specific contractual obligation."); Mount Sinai Medical Center of Greater Miami, Inc. v. Heidrick & Struggles, Inc., 329 F. Supp. 2d 1309, 1312 (S.D. Fla. 2004) ("Because H&S did not breach an express term of the contract, Mount Sinai's claim for breach of the implied covenant of good faith and fair dealing fails."); Maxwell v. First United Bank, 782 So. 2d 931, 935 (Fla. 4th DCA 2001) ("Without an express duty regarding transfer of participation interest in the loan, there can be implied duty of good faith and fair dealing in verifying the proper transfer of such interests.").

Instead, the Plaintiffs point to Sections 1.2 and 2.3 of the MSA, as well as the "essential purpose of the MSA" as evidence that Martin Marietta breached its implied duties.

41

Section 1.2 of the MSA simply grants Martin Marietta the right to enter the three quarries and to take all action permitted under the mining leases. (Doc. 44-11, p. 2). Section 2.3 of the MSA provides that Martin Marietta "shall have the right, **but not the obligation**, to deal directly with the Mining Lessors regarding any matters affecting the Quarries and, if Martin Marietta so elects, to directly satisfy any obligation of [either Plaintiff] under the Mining Leases with respect to such owners or to take any other action it deems appropriate to maintain the Mining Leases in full force and effect." (Id., pp. 5-6) (emphasis added). Not only is there a complete absence of any language in these two Sections even suggesting that Martin Marietta was required to renew the Clifton and O'Neal leases (both of which at all relevant times remained in the names of the Plaintiffs), but Section 2.3 makes it patently clear that Martin Marietta was not obligated to renew the leases, or to deal with the owners of either quarry at all. To hold otherwise would vary the express terms of the MSA, in contravention of Florida law. See Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1098 (Fla. 1st DCA 1999) ("[T]he implied obligation of good faith cannot be used to vary the express terms of a contract."); Hospital Corp. of America, 710 So. 2d at 575 ("Allowing [the plaintiff] to pursue a claim for breach of duty of good faith where no enforceable executory contractual obligation on [the defendant's] part remained would add an obligation to the contract which was not negotiated by the parties and not in the contract.").

The allegations concerning Martin Marietta's obligation to repair and maintain the mining equipment require closer review. Section 2.2 of the MSA provides, in relevant part:

While Martin Marietta will be entitled to use equipment and facilities owned or leased by [White Construction and Limerock Industries] located at the Quarries . . . [White Construction and Limerock Industries] acknowledge and agree that Martin Marietta intends to modernize and expand the Business by replacing the equipment and related facilities at the Quarries with its own equipment and facilities as soon as Martin Marietta determines, in its sole discretion, that it is commercially reasonable to do so. Accordingly, Martin Marietta, in its sole determination, may choose to utilize any of the equipment or items at the Quarries as listed on Exhibit 1.3, at the particular Quarry where any such equipment or item is currently located or at any of the other Quarries hereunder, relocate the equipment or items set forth in Exhibit 1.3 to another facility operated by Martin Marietta, or release equipment and/or related facilities from time to time from use by Martin Marietta and relinquish all rights hereunder to use such items. Under such circumstances, Martin Marietta shall notify [White Construction and Limerock Industries] of its release of equipment and other items hereunder, whereupon [White Construction and Limerock Industries] will resume sole responsibility for such equipment and items. Such equipment and items shall be relocated by Martin Marietta to a designated storage area located at one of the Quarries and if practicable, [White Construction and Limerock Industries] will be responsible for removing such released equipment or other items from the Quarries, and thereafter using or disposing of the same in such manner as may be decided by [White Construction and Limerock Industries] in their sole discretion. If any equipment or other items relocated by Martin Marietta to the designated storage area is not removed by [White Construction and Limerock Industries] within twelve (12) months, Martin Marietta, at its sole option, may sell said equipment or items and distribute the net proceeds to [White Construction and Limerock Industries]. If the equipment or other items cannot be sold, then Martin Marietta may cannibalize the same for parts or otherwise dispose of it without liability or recourse.

During the time that Martin Marietta uses in its operations at the Quarries or elsewhere equipment and other items owned or leased by [White Construction and Limerock Industries] and not previously released hereunder, Martin Marietta, at its expense,

will repair and maintain such equipment and other items in accordance with its normal business practices. The parties understand, however, that such repair and maintenance obligation is only intended to cover routine repairs and maintenance. If Martin Marietta, in its sole discretion, determines that any such individual equipment or other items require major repairs or renovations, or if it would otherwise require expenditures by Martin Marietta individually or in the aggregate in an amount greater than One Thousand Dollars ($1,000), or if Martin Marietta determines that such equipment or other items would have little or no commercial value to Martin Marietta in the operation of the Quarries if repaired or renovated, then Martin Marietta will not be obligated to make such repairs or renovations, and Martin Marietta will be entitled to release such equipment or other items from use at the Quarries as provided in the immediately preceding paragraphs. . . .

(Doc. 44-11, pp. 4-5).

The Plaintiffs contend that Martin Marietta breached this portion of the MSA when it failed to repair and maintain the equipment located at the Cabbage Grove quarry. Specifically, Stephen Pomery testified both at his deposition and in his subsequent declaration that Martin Marietta disassembled several of White Construction's "mills," which are processing units consisting of screens, crushers, and other items that White Construction had constructed at great cost, and that Martin Marietta moved the mill components to the northwest corner of the quarry.[34] Pomeroy also testified that Martin Marietta took apart a dragline and removed other equipment from service at Cabbage

---

[34]Second Declaration of Stephen G. Pomeroy, ¶ 4 (Doc. 100); Deposition of Stephen G. Pomeroy, dated November 10, 2006, pp. 86-93 (Doc. 82-22).

Grove.[35]  Martin Marietta notified White Construction that it was releasing this equipment on or about September 29, 2006.[36]

Based on this testimony - the only evidence provided by either side on this issue - it is undisputed that Martin Marietta did not breach Section 2.2 of the MSA.  Rather, Mr. Pomeroy makes clear in his testimony that Martin Marietta did exactly what it was authorized to do under the terms of the Agreement.  Martin Marietta, in its sole discretion, determined that it no longer wished to use the mills and dragline, relocated these items to another portion of the quarry, and notified White Construction of its actions.  When directly asked, Mr. Pomeroy was unable to state how much time had elapsed between the date Martin Marietta relocated the equipment and the date it notified White Construction that the equipment had been released, and the Plaintiffs have provided no other evidence which would support its claim that Martin Marietta either abused its discretion in its handling of the equipment, or breached its duty to repair, maintain, and/or release the equipment.[37] Because there are no undisputed facts on this point, the Court concludes that there has been no breach of Section 2.2 of the MSA.[38]

---

[35]Pomeroy Declaration, ¶ 4.

[36]Id., ¶ 5.

[37]The Court further notes that there is nothing in the MSA obligating Martin Marietta to notify White Construction and/or Limerock Industries before Martin Marietta relocated the released equipment, nor is there any time limit for when Martin Marietta must provide notification of the released equipment.

[38]The Court also finds persuasive Section 7.8 of the MSA, which mandates that "no act or
(continued...)

Summary judgment shall be granted as to Count IV.

## V. Count Five:  Breach of Contract - The Mining Services Agreement

In order for White Construction and Limerock Industries to survive summary judgment on their fifth claim, they must establish that genuine issues of material fact exist as to whether a material breach of the MSA occurred.  See Abbott Labs., Inc. v. GE Capital, 765 SO. 2d 737, 740 (Fla. 5th DCA 2000) (listing elements of a breach of contract action).  The Plaintiffs point to the exact same alleged breaches of the MSA that they rely on in their prior claim:  (1) that Martin Marietta allowed the leases on the Clifton and O'Neal quarries to expire; and (2) that Martin Marietta failed to repair and maintain the equipment and assets and/or failed to notify the Plaintiffs that it was releasing the equipment.  (Doc. 44, ¶¶ 77-78).

Summary judgment is warranted as to this claim because, as discussed in Count IV above, the MSA does not obligate Martin Marietta to renew either lease, and there are no disputed issues of fact as to whether Martin Marietta breached its obligations concerning its handling of the White Construction and Limerock Industries' mining equipment.[39]

---

[38](...continued)
failure to act by any party shall be deemed a default under the terms of this Agreement, and no party shall seek to recover any amount as monetary damages or any other relief from another with respect thereto, without first having given the party who has acted or failed to act in violation of the Agreement written notice of the default and an opportunity for a period of sixty (60) days to cure the violation . . . ."  (Doc. 44-11, p. 18).  It is undisputed that neither Plaintiff ever provided any such written notice to Martin Marietta with respect to its alleged breach of Section 2.2, and the Plaintiffs' attempt to rely on the filing of its original complaint in this case as the requisite written notice fails by virtue of the plain language of Section 7.8.

[39]To the extent White Construction and Limerock Industries are contending that the MSA is not a valid contract because it was procured by fraud, such argument fails both because the
(continued...)

VI.    Count Six:  Unjust Enrichment

The Plaintiff's sixth claim is based on the equitable remedy of unjust enrichment. White Construction and Limerock Industries allege that based on Martin Marietta's promises to eventually purchase their equipment and assets under the terms of the LOI, they allowed Martin Marietta to negotiate a lease for the Cabbage Grove Quarry in Martin Marietta's own name.  As a result, Martin Marietta has received monies from the sale of limerock materials mined from Cabbage Grove that otherwise would have been earned by White Construction and Limerock Industries.  The Plaintiffs contend that it would be inequitable to allow Martin Marietta to retain these funds.  (Doc. 44, ¶¶ 81-84).

The elements of a claim for unjust enrichment are:  (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof.  Hercules, Inc. v. Pages, 814 F. Supp. 79, 80 (M.D. Fla.1993) (citing Henry M. Butler, Inc. v. Trizec Properties, Inc., 524 So.2d 710, 712 (Fla. 2d DCA 1988)); see also Extraordinary Title Services, LLC v. Florida Power & Light Co., 1 So. 3d 400 (Fla. 3d DCA 2009).  However, "Florida courts have held that a plaintiff cannot pursue a quasi-contract claim for unjust

---

[39](...continued)
Court has determined that the MSA is valid and enforceable, and because the Plaintiffs have sued for damages under various tort theories, thereby affirming the contract and its terms.  See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co., 761 So. 2d 306, 313 (Fla. 2000) (holding that fraudulent inducement claim for damages affirms contract and thus ratifies its provisions).

enrichment if an express contract exists concerning the same subject matter." <u>Diamond "S"</u> <u>Dev. Corp. v. Mercantile Bank</u>, 989 So. 2d 696, 697 (Fla. 1st DCA 2008); <u>see</u> <u>also</u> <u>Kovtan</u> <u>v. Frederiksen</u>, 449 So. 2d 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter.").

In this case, the Court concludes that a valid and express contract exists which covers the same subject matter as the alleged implied or quasi-contract. White Construction and Limerock Industries allege that Martin Marietta promised to purchase their mining equipment and assets for $15.5 million once White Construction's legal issues were concluded. This promise is directly contradicted by the terms of the MSA, (a contract the Court has already determined as a matter of law is valid and enforceable), which states in plain terms that Martin Marietta has the option to purchase the equipment and assets at their current fair market value. The MSA also has a comprehensive merger and integration clause, stating that any and all prior agreements and understandings between the Parties are superseded by the terms of the MSA itself. In other words, the MSA addresses the same subject matter over which White Construction and Limerock Industries seek to create an implied contract. Indeed, there is no dispute that Martin Marietta has been compensating the Plaintiffs for the use of the Cabbage Grove land and mining operations under the terms of the MSA, for several years.[40]

---

[40]The Plaintiffs' continued argument that the MSA does not cover the Cabbage Grove Quarry is of no avail. As previously discussed, the MSA clearly and unambiguously governs the mining operations and activities at all three quarries, and in particular, Martin Marietta's use of

(continued...)

White Construction's and Limerock Industries' unjust enrichment claim is therefore defeated by the express agreement between the Parties set forth in the MSA.  See Lafarge North America, Inc. v. Matraco Colorado, Inc., No. 07-80112-CIV, 2008 WL 2277503, *7 (S.D. Fla. May 30, 2008).  Wummary judgment in favor of Martin Marietta as to Count VI shall be granted.

VII.    Count Seven:  Promissory Estoppel

The Plaintiffs next allege that these same promises to eventually purchase their assets under the terms listed in the LOI induced them to terminate their lease on the Cabbage Grove quarry, to execute the Termination Agreement, and to enter into the MSA, and that Martin Marietta breached its oral promises when it later refused to consummate the sale.  White Construction and Limerock Industries further allege that:  (1) Martin Marietta should have expected them to rely on these promises; (2) it was reasonable to rely on Martin Marietta's statements; and (3) the Plaintiffs suffered harm in the form of the lost value of the Cabbage Grove lease, lost profits from the sale of limerock mined from all three quarries, and lost profits from the sale of their assets.  The Plaintiffs seek damages and contend that Martin Marietta's alleged oral promises should be enforced to avoid injustice. (Doc. 44, ¶¶ 86-92).

The Florida Supreme Court in W.R. Grace and Co. v. Geodata Services, Inc., 547 So. 2d 919 (Fla. 1989), explained that:

---

[40](...continued)
White Construction's and Limerock Industries' equipment and facilities at each quarry.

The basic elements of promissory estoppel are set forth in Restatement (Second) of Contracts § 90 (1979), which states:

> (1) A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

The character of the reliance protected is explained as follows:

> The promisor is affected only by reliance which he does or should foresee, and enforcement must be necessary to avoid injustice. Satisfaction of the latter requirement may depend on the reasonableness of the promisee's reliance, on its definite and substantial character in relation to the remedy sought, on the formality with which the promise is made, on the extent to which the evidentiary, cautionary, deterrent and channeling functions of form are met by the commercial setting or otherwise, and on the extent to which such other policies as the enforcement of bargains and the prevention of unjust enrichment are relevant.

W.R. Grace & Co., 547 So. 2d at 924.

Martin Marietta seeks summary judgment on this claim because: (1) the oral promises are unenforceable under Florida's Statute of Frauds; (2) the alleged oral promises are too conceptual and are not definite in time, term, or reasonableness; and (3) the alleged oral promises are contradicted by the terms of the MSA, thereby rending any reliance on the oral promises unreasonable.

Martin Marietta's first two arguments are not persuasive. There are at least material issues of fact concerning whether the Plaintiffs partially performed under the oral promises,

thereby removing this claim from the Statute of Frauds.[41] Material issues of fact also exist as to whether the oral promises are sufficiently definite - there is record evidence concerning the proposed purchase price of the mining equipment and assets, as well as a potential date for performance.

Martin Marietta's last argument is well founded. The Court concludes, as a matter of law that it was not reasonable for White Construction and Limerock Industries to rely on Martin Marietta's oral promises in light of the plain and express terms of the MSA, which cover the same subject matter as the oral promises, and which contain a comprehensive merger and integration clause. See Advanced Marketing Systems Corp. v. ZK Yacht Sales, 830 So. 2d 924, 928 (Fla. 4th DCA 2002) (holding that claim for promissory estoppel is not available where a written contract exists between the parties covering the same subject matter); Gowni v. BP Corp. North America, Inc., No. 6:01CV1405-ORL-28KRS, 2003 WL 24051561, ** 7-8 (M.D. Fla. May 9, 2003) (reliance on oral representations not reasonable where subsequent and contemporaneous written agreements contradicted representations, and contained merger clauses).[42] The fact that the alleged oral promises were made both prior and subsequent to the drafting and execution of the MSA makes reliance all the more unreasonable because the Plaintiffs were aware that the MSA contradicted the oral

---

[41]See, e.g., Miller v. Murray, 68 So. 2d 594 (Fla. 1953); Elliott v. Timmons, 519 So. 2d 671 (Fla. 1st DCA 1988).

[42]See also University of Miami v. Intiuitive Surgical, Inc., 353 F. Supp. 2d 1230, 1236 (S.D. Fla. 2005); Eclipse, 262 F. Supp. at 1351; Barnes, 932 F. Supp. at 1441

promises, yet went forward with the agreement.  See Gowni, 2003 WL 24051561, * 8.

Given these undisputed facts, the Court cannot permit the promissory estoppel claim to go

forward.  Summary judgment shall be granted as to Count VII.

VIII.    Count Eight: Quantum Meruit

As with their claim for unjust enrichment, White Construction and Limerock Industries'

claim for quantum meruit fails due to the existence of the MSA.  This claim is also premised

upon a theory that an implied contract existed between the Parties for the purchase by

Martin Marietta of the assets listed in the LOI for $15.5 million, and that Martin Marietta

agreed to consummate the purchase as soon as White Construction's criminal proceedings

were resolved.  (Doc. 44, ¶¶ 94-96).  However, unlike their unjust enrichment claim which

is based on a theory of an implied in law agreement, the Plaintiffs now contend that their

quantum meruit claim actually refers to an implied in fact contract.

This argument is unpersuasive.  As with implied in law contracts, a claim of an implied

in fact contract cannot survive where a valid, express contract exists that covers the same

subject matter.  See Excess Risk Underwriters, 328 F. Supp. 2d at 1345-46 (granting

summary judgment on implied in fact contract/quantum meruit claim where subject matter

was governed by an express contract); LynkUs Communications, Inc. v. WebMD Corp., 965

So. 2d 1161, 1167-68 (Fla. 2d DCA 2007) (affirming grant of summary judgment on

quantum meruit claim where subject matter of claim was covered by express written

agreement between the parties); Ocean Communications, Inc. v. Bubeck, 956 So. 2d 1222,

1225 (Fla. 4th DCA 2007) ("[A] plaintiff cannot pursue an equitable theory, such as unjust

52

enrichment or quantum meruit, to prove entitlement to relief if an express contract exists."); Cross v. Strader Const. Corp., 768 So. 2d 465, 466 (Fla. 2d DCA 2000) ("Quantum meruit damages cannot be awarded when an enforceable contract exists."). See also Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) ("It is well settled that the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract."). The Plaintiffs have provided no decisional or other authority to the contrary.

Summary judgment in Martin Marietta's favor is warranted as to this claim.

IX.   Count Nine:  Breach of Oral Contract - Termination of Cabbage Grove Lease

White Construction's and Limerock Industries' claim for breach of oral contract also relies on the events surrounding the termination of their lease with Foley.  Specifically, the Plaintiffs allege that they entered into an oral contract with Martin Marietta sometime between March 22, 2002 and April 2, 2002 whereby Martin Marietta promised to purchase the mining equipment and assets for $15.5 million once White Construction's criminal proceedings ended, if the Plaintiffs would terminate their lease with Foley for the Cabbage Grove quarry, sign the Termination Agreement, and allow Martin Marietta to negotiate a new lease in its own name.  (Doc. 44, ¶ 102).  The Plaintiffs further contend that they performed their portion of the oral contract when they executed the Termination Agreement with Foley and did not seek an extension or renewal of their lease, but that Martin Marietta subsequently breached the oral contract when it refused to purchase the mining equipment and assets in July 2004.

Martin Marietta argues that summary judgment is warranted because White Construction and Limerock have not established all of the elements of their claim, and because the oral contract is barred by the statute of frauds. The Court agrees that this claim is barred by Florida's Uniform Commercial Code Statute of Frauds, Fla. Stat. § 672.201. Pursuant to that section:

> a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his or her authorized agent or broker.

Fla. Stat. § 672.201(1).[43] Neither side disputes that the purported oral contract at issue involved the sale of goods for more than $500, therefore, unless some writing exists, the statute of frauds would render the oral contract unenforceable. See Kolski ex rel. Kolski v. Kolski, 731 So. 2d 169, 171-72 (Fla. 3d DCA 1999) ("To satisfy the statute, a note or memorandum may take almost any possible form.").

White Construction and Limerock Industries point to the September 27, 2001 LOI as the writing memorializing the purported oral contract, and which satisfies the Statute of Frauds. However, the LOI was executed approximately six (6) months **prior** to the making

_____

[43]Both sides also refer to Fla. Stat. § 725.01, which is the Florida's general Statute of Frauds governing oral contracts for the sale of lands and leases for periods of longer than 1 year, as well as for contracts that are not be performed within the space of 1 year. The oral contract at issue is not a contract for the sale of lands or for a lease between the Parties, it is a contract for the purchase of various assets. There is also a disputed issue of fact as to whether the agreement could be performed within a year. See Yates v. Ball, 181 So. 341, 344 (Fla. 1938). Therefore, § 725.01 does not apply.

of the alleged oral contract and expired by its own terms on March 1, 2002, well before the making of any oral promises. In such circumstances, the LOI cannot satisfy Florida's Statute of Frauds because the LOI and the alleged oral contract are two separate and independent events. See H.P.B.C., Inc. v. Nor-Tech Powerboats, Inc., 946 So. 2d 1108, 1111-12 (Fla. 2d DCA 2007) (previously executed and now expired written contract cannot form basis of a "writing" for Statute of Frauds purposes for subsequent oral contract, even though oral contract "mirrored" terms in earlier written agreement); Jones v. Toms, 9 So.2d 96, 97 (Fla. 1942) ("The law requires that for the memorandum to be sufficient it must satisfactorily show that a contract has actually been made."). See also Roboserve, Ltd. v. Tom's Foods, Inc., 940 F.2d 1441, 1449 (11th Cir. 1991) (holding that writings that predate oral contract are insufficient "to indicate that a contract for sale has been made between the parties" under Georgia's Uniform Commercial Code Statute of Frauds, which is identical to Fla. Stat. § 672.201). Because the oral contract to purchase the Plaintiffs' mining equipment and assets in exchange for the Plaintiffs' execution of the Termination Agreement is not in writing and is not signed by the party against whom enforcement is sought, this claim cannot go forward.

The Plaintiffs' argument that they partially performed under the oral contract when they executed the Termination Agreement does not remove the oral agreement from the Statute of Frauds. "Florida courts have uniformly held that the 'performance exception' to the Statute of Frauds, which arose in sale of land cases, applies only when a plaintiff seeks purely equitable relief." Eclipse Medical, Inc., 262 F. Supp. 2d at 1346, n. 6 (citing Elsberry

v. Sexton, 54 So. 592 (1911)); LynkUs Communications, 965 So. 2d at 1166 ("the doctrine of part performance does not apply to actions for the recovery of damages for alleged breach of an oral contract within the operation of the statute of frauds."). Here, White Construction and Limerock Industries are seeking unspecified damages and do not appear to be seeking equitable relief in the form of specific performance of the oral contract.

Moreover, even if the Statute of Frauds did not apply, and an enforceable oral contract existed (or at least material issues of fact), the plain terms of the MSA defeat this claim. Not only does the MSA (an agreement that was undisputedly negotiated at arms-length with legal representation on both sides) expressly contradict Martin Marietta's alleged oral promise to purchase the assets at a price certain, but the MSA's merger and integration clause provides that any prior agreements and understandings between the Parties with respect to the mining operations at all three quarries, as well as the purchase of the assets, are superseded by the MSA itself. (Doc. 44-11, Section 8.3, p. 22). At the time the Plaintiffs entered into the MSA, they accepted all terms and obligations under the Agreement, including the obligation to be bound by the integration clause. See Rodriguez v. Tombrink Enterprises, Inc., 870 So. 2d 117, 119 (Fla. 2d DCA 2003) (affirming entry of summary judgment on breach of oral contract claim where subsequent written contract contained an integration clause); Aly Handbags, Inc. v. Rosenfeld, 334 So. 2d 124, 126 (Fla. 3d DCA 1976) ("The well established rule of law is that a contract may be discharged or extinguished by merger into a later contract entered into between the parties in respect to the same subject which replaces the original contract."). See also Johnson Enterprises,

162 F.3d at 1309 (noting that prior or contemporaneous oral agreements cannot vary or contradict the unambiguous language of a valid written contract with a merger clause); Topp, Inc., 483 F. Supp. 2d at 1206 (no oral agreement existed where subsequent written contract covered same subject matter and stated that it terminated all other agreements between the parties).

Summary judgment shall be granted on Count IX.

## X.    Count Ten:  Fraud in the Inducement - The Termination Agreement

White Construction's and Limerock Industries' tenth claim also arises out of events surrounding the Cabbage Grove mining lease.  They assert that Martin Marietta's allegedly false representations concerning their future purchase of their assets induced them to allow their lease of Cabbage Grove to expire, and to enter into the Termination Agreement.  The Plaintiffs further allege that they were justified in relying on Martin Marietta's false representations, and that they have suffered damages in the form of the lost lease and lost mining revenues.  (Doc. 44, ¶¶ 107-112).

Martin Marietta contends that it is entitled to summary judgment because the alleged oral promise is unenforceable under Florida's Statute of Frauds, and because the language of the Termination Agreement contradicts the oral promise.  Neither argument is persuasive. Whether or not the oral promise is enforceable under the Statute of Frauds is not relevant to the resolution of this particular claim.  The Statute of Frauds is used to determine whether an oral promise is itself valid and enforceable in situations where a party is seeking relief

based on the promise itself - either in the form of damages or specific performance.[44]  In this claim, however, the Plaintiffs are not seeking enforcement or damages from the oral promise, under either contract or tort law, but are instead merely citing the oral promise as proof of the alleged fraud by Martin Marietta which led the Plaintiffs to engage in behavior that ultimately caused them  harm.  In other words, while the Plaintiffs may have entitled Count X as a claim of "fraudulent inducement" it is clear that this claim is much more akin to a garden variety claim of fraud, and the Defendants have not provided any legal authority to support the use of Florida's Statute of Frauds under facts similar to the present claim.

Martin Marietta's argument that the language of the Termination Agreement mandates summary judgment is equally unavailing.  It is clear that in Florida where a written agreement either expressly contradicts a prior or contemporaneous oral statement or is silent on the subject matter, a claim for fraudulent inducement cannot lie.  Mac-Gray Services, 913 So. 2d at 634;  (Fla. 4th DCA 2005); Eclipse Medical, 262 F. Supp. 2d at 1342.  However, this rule of law only applies in situations where the parties who make and receive the oral representations are the same parties to the written contract.  See  SEB S.A., 2005 WL 1926418 at * 20 ("reliance on representations by a contracting party in a suit

---

[44]See Fla. Stat. §§ 672.201; 680.201.  See also India America Trading Co. v. White, 896 So. 2d 859, 860 (Fla. 3d DCA 2005) (holding that a fraudulent inducement claim will not lie where it is nothing more than an action to seek enforcement of an oral contract for the sale of land); Dewachter v. Scott, 657 So. 2d 962, 963 (Fla. 4th DCA 1995) (action for fraud was an improper attempt to seek damages for breach of oral contract under statute of frauds); Canell v. Arcola Housing Corp., 655 So. 2d 849, 851 (Fla. 1953) (breach of contract action barred by statute of frauds cannot be brought indirectly as a fraud action because "an action for damages cannot be maintained on the ground of fraud in refusing to perform the contract, even though the defendant at the time of the making of the oral contract may have had no intention of performing it.").

based on the contract is unreasonable where the representations are not contained in the subsequent written agreement between the parties.").[45] Here, the Termination Agreement is between White Construction, Limerock Industries, and Foley - Martin Marietta (the party who made the allegedly false oral representation) is not a party to the agreement.

The Court further concludes that material issues of fact remain in dispute as to at least three of the elements of the Plaintiffs' claim. The Parties have presented conflicting evidence as to whether anyone at Martin Marietta ever expressly promised to purchase the Plaintiffs' assets in exchange for the Plaintiffs' execution of the Termination Agreement, as well as to whether the Plaintiffs were justified in relying on such representations. There is also a disputed issue of fact as to whether the Plaintiffs suffered any damages because it is unclear whether Foley would have renewed its lease with White Construction and Limerock Industries at that time. Based on these numerous issues of material fact, summary judgment shall be denied as to this claim.[46]

---

[45]Notably, all of the decisions cited by the Defendants involve situations where the same entity both made the allegedly false representation, and was one of the contracting parties in the subsequent written contract. See e.g., Cibran, 365 F. Supp. 2d at 1253; Eclipse Medical, 262 F. Supp. 2d at 1342; Barnes, 932 F. Supp. at 1428. The Court has been unable to find any authority supporting Martin Marietta's interpretation of this rule of law.

[46]Martin Marietta's argument that the Termination Agreement was completely independent from Foley's subsequent lease with Martin Marietta is similarly replete with disputed issues of fact. At a minimum, the Plaintiffs have presented evidence that the two contracts were closely intertwined.

XI.    Count Eleven:  Tortious Interference

The Plaintiffs' last claim concerning the Cabbage Grove lease is premised on a theory that Martin Marietta intentionally and unjustifiably interfered with their advantageous business relationship with Foley by telling Foley that White Construction would not be able to continue long-term business operations due to its pending criminal proceedings.  White Construction and Limerock Industries allege that Martin Marietta made this representation with the intent to:  (1) interfere with and damage their contractual relationship with Foley; and (2) cause Foley to prefer a long-term lease with Martin Marietta instead.  (Doc. 44, ¶¶ 115-117).  The Plaintiffs do not base this claim on their termination of the Cabbage Grove lease, but rather focus on the loss of the ability to renew the lease with Foley and/or to sell their continuing leasehold rights to another entity after April 1, 2002.

To establish a claim for tortious interference, the Plaintiffs must establish: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the business relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." Tamiami Trail Tours, Inc. v. Cotton, 463 So. 2d 1126, 1127 (Fla. 1985); see also KMS Restaurant Corp. v. Wendy's International, Inc., 361 F.3d 1321, 1325 (11th Cir. 2004).

Martin Marietta contends that there was no existing business relationship between the Plaintiffs and Foley after April 1, 2002 because, at that point, the Cabbage Grove lease had expired by its own terms and there is no evidence that Foley would have renewed the

lease at that time. The Court disagrees - White Construction and Limerock Industries have presented record evidence in the form of the deposition testimony of Dennis Carey and James Odom (the business representatives from Foley) establishing at the very least a question of fact as to whether Foley would have renewed its lease with the Plaintiffs, as well as to what extent Martin Marietta's statements played into Foley's decision-making process. These factual disputes are best left for the trier of fact to resolve. Summary judgment is denied as to Count XI.

XII. Count Twelve: Civil Theft

White Construction's and Limerock Industries' final claim alleges that Martin Marietta committed civil theft in violation of Florida Statute § 812.014(1) by: (1) obtaining the lease for Cabbage Grove in Martin Marietta's own name, and encouraging the Plaintiffs to execute the Termination Agreement, while never intending to purchase the mining equipment and assets for $15.5 million; (2) convincing White Construction and Limerock Industries to allow Martin Marietta to utilize their mining equipment in exchange for the false promise to eventually buy the equipment for $15.5 million; and (3) obtaining the rights to negotiate new leases for the Clifton and O'Neal quarries, but instead allowing those leases to expire. The Plaintiffs further allege that the payments Martin Marietta made under the terms of the MSA did not reflect the true value of the lease rights and mining equipment, and that the MSA was only intended to be an interim agreement. (Doc. 44, ¶¶ 122-23).

To establish a claim for civil theft, the Plaintiffs must show that Martin Marietta "knowingly obtained or used, or endeavored to obtain or to use, the property of another with intent to, either temporarily or permanently (a) deprive the other person of a right to the property or a benefit from the property; or (b) appropriate the property to his or her own use or to the use of any person not entitled to the use of the property." Fla. Stat. § 812.014(1). The Plaintiffs must also show that Martin Marietta did so with the felonious intent to commit theft. See Florida Desk, Inc. v. Mitchell International, Inc., 817 So. 2d 1059, 1060 (Fla. 5th DCA 2002); Rosen v. Marlin, 486 So. 2d 623, 625 (Fla. 3d DCA 1986).

The Court concludes that genuine, material issues of fact exist with respect to Martin Marietta's execution of a mining lease with Foley for Cabbage Grove, as well as with respect to the Plaintiffs' execution of the Termination Agreement. While the Court is not entirely convinced the Plaintiffs will ultimately prevail on this claim, it is possible to interpret the record evidence to show that Martin Marietta intentionally deceived White Construction and Limerock Industries in order to obtain the Cabbage Grove lease, and that the Plaintiffs suffered harm through the loss of both the lease itself, and their continuing rights to remove their equipment and facilities.

Summary judgment is appropriate, however, on the portion of the Plaintiffs' claim seeking damages for Martin Marietta's refusal to purchase the mining equipment and assets for $15.5 million. It is undisputed that on July 17, 2002, White Construction, Limerock Industries, and Martin Marietta entered into the MSA, a valid and enforceable agreement which governed the future purchase of these assets and equipment. It is further undisputed

62

that Martin Marietta has performed under the terms of the MSA, and made all payments required, and that the MSA was not procured by means of any fraudulent inducements. Accordingly, there is no evidence that Martin Marietta obtained anything it was not entitled to, or that either White Construction or Limerock Industries suffered any injury. Rather, they have obtained exactly what they bargained for.

This portion of the civil theft claim is also derivative of the Plaintiffs' breach of contract claims, both oral, written, and implied. As the Court has previously determined that those claims are not sustainable, the civil theft claim also fails. See Gambolati v. Sarkisian, 622 So. 2d 47, 50 (Fla. 4th DCA 1993) ("[A]n action in tort is inappropriate where the basis of the suit is a contract, either express or implied.") (quoting Belford Trucking Co. v. Zagar, 243 So. 2d 646, 648 (Fla. 4th DCA 1970)); Advanced Surgical Technologies, Inc. v. Automated Instruments, Inc., 777 F.2d 1504, 1507 (11th Cir.1985) ("section 812.014 does not apply to ordinary breaches of contract. . . ."); Muniz v. GCA Services Group, Inc., No. 3:05-cv-172-J-33MMH, 2006 WL 2130735 at * 9 (M.D. Fla. July 28, 2006) (holding that where breach of contract claims are not sustainable, civil theft claims based on the same subject matter are also unsustainable).

Summary judgment is also warranted with respect to the expiration of the Clifton and O'Neal leases for the simple fact that there is no evidence that Martin Marietta ever deprived the Plaintiffs of their use of either quarry. The Court has previously held as a matter of law that Martin Marietta was under no obligation to renew the leases - a fact made clear by the plain and express terms of the MSA - and that they operated the mining

facilities at the two quarries under the terms and conditions of the arms-length MSA. Moreover, there is no evidence in the record that Martin Marietta operated with a felonious intent as to either lease. To the contrary, the evidence is undisputed that Martin Marietta engaged in a lengthy, arms-length, detailed negotiation process with the owners of both quarries, and that the leases expired solely due to the owners' independent decisions to lease to other entities. Summary judgment shall be granted in part and denied in part as to Count XII.

## Conclusion

Accordingly, upon due consideration, it is hereby ORDERED AND ADJUDGED as follows:

(1) The Defendants' Motion for Final Summary Judgment (Doc. 80) is GRANTED IN PART AND DENIED IN PART. Summary judgment in favor of Defendants Martin Marietta Materials, Inc. and Martin Marietta Materials of Florida, LLC and against Plaintiffs White Construction Company, Inc. and Limerock Industries, Inc. is granted as to Counts I-IX of the Plaintiffs' Third Amended Complaint (Doc. 44), and as to the portion of Count XII (the Civil Theft claim), relating to the purchase of the Plaintiffs' mining equipment and assets, and renewal of the Clifton and O'Neal mining leases. The Plaintiffs may go forward with their claim for fraudulent inducement with respect to the Termination Agreement (Count X), their claim for tortious interference with business relationship (Count XI), and that portion of the

civil theft claim (Count XII) relating to the Cabbage Grove mining lease and the Termination Agreement;

(2) The Defendants' Motion to Dismiss Third Amended Complaint (Doc. 50) is DENIED AS MOOT, and the Defendants shall file their Answer to the remaining claims set forth in the Third Amended Complaint within twenty (20) days from the date of this Order;

(3) The Clerk is directed to reschedule this case for final pretrial conference and trial for the term commencing June 1, 2009. The Parties shall file an amended pretrial statement prior to the date of the pretrial conference, within the time frames set forth in the applicable Federal Rules of Civil Procedure and the Local Rules of this Court;

(4) The Parties' Joint Motions for Status Conference (Docs. 210-211) are DENIED AS MOOT; and

(5) The Clerk is further directed to withhold the entry of judgment pending resolution of all remaining claims.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 7th day of April, 2009.

UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
             Maurya A. McSheehy